**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr>
<td>

**SMS DC CS01B, LLC d/b/a**
**Scale Microgrids,**
51-53 S. Broad Street
Ridgewood, NJ 07450

    *Plaintiff*,

v.

**BLUE OCEAN NEW ENERGY LLC,**
705 Edgewood St NE, Suite 110
Washington, DC 20002

    **SERVE ON REGISTERED AGENT**:
    Corporation Service Company
    1156 15th Street NW
    Suite 605
    Washington, DC 20005

    *Defendant*.

</td>
<td>

**Case No. 1:26-cv-1102**

**JURY TRIAL DEMANDED**

</td>
</tr>
</table>

**COMPLAINT**

COMES NOW, Plaintiff, SMS DC CS01B, LLC, d/b/a Scale Microgrids ("Plaintiff" or "Scale"), by and through undersigned counsel, and in support of this Complaint against Defendant, Blue Ocean New Energy LLC ("Defendant" or "BONE"), for Breach of Contract and states as follows:

**NATURE OF THE CASE**

1. This action arises out of Defendant's breach of its express contractual obligations in connection with the design, procurement, and construction of a solar photovoltaic canopy system to be installed at the Model Secondary School for the Deaf Garage at Gallaudet University located at 800 Florida Ave NE, Washington, DC 20002 (the "MSSD Garage Canopy Project" or the "Project").

1

2.　　　Plaintiff contracted with Defendant to provide engineering, procurement, and construction services for the Project pursuant to a Commercial Solar EPC Contract dated June 30, 2022, and a related Statement of Work dated August 24, 2023 (collectively, the "EPC Contract"). A true and accurate copy of the EPC Contract is attached hereto as **Exhibit A**.

3.　　　Despite Plaintiff's payment of $1,115,756.00 according to the milestone payment schedule under the EPC Contract based on Defendant's false representations, the Project was not completed in any way as a result of Defendant's failures. Plaintiff received nothing in return for the consideration paid. To make matters worse, after Plaintiff cancelled the Project, Defendant refused to remediate what changes to the site they had caused, which forced Plaintiff to hire another contractor to restore the roof and lighting of the MSSD Garage back to its original, working condition.

4.　　　As a result, Plaintiff has been damaged in an amount exceeding $1,168,003.00 which represents payments made to Defendant for a project that could not be—and was not—completed plus the cost to restore the MSSD Garage back to working condition. Additionally, Plaintiff is also entitled to delay damages in the amount of $218,500.00, as set forth in the EPC Contract due to Defendant's failure to timely complete the project. As the non-defaulting party, Plaintiff also seeks attorneys' fees, costs, and other expenses pursuant to Section 22.2 of the parties' EPC Contract.

## THE PARTIES

5.　　　Plaintiff SMS DC CS01B, LLC is a Delaware limited liability company.  For purposes of diversity jurisdiction, Plaintiff is a resident of Delaware and New Jersey because its non-LLC parent company is a Delaware corporation with its principal place of business at 51 S. Broad St, Ridgewood, NJ 07450. Plaintiff specializes in designing, building, financing, operating

and maintaining the Project for the production of energy and performance of services for the benefit of the end customer where the Project is located and the utility.

6. Defendant Blue Ocean New Energy, LLC, d/b/a New Columbia Solar is a Delaware limited liability company. Upon information and belief, for purposes of diversity jurisdiction, Defendant is a resident of the District of Columbia and Virginia.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant 28 U.S.C. § 1332(a) as the sum or value of this matter, exclusive of interest and costs, exceeds $75,000.00 and is between citizens of different states.

8. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in the District of Columbia and has transacted business in the District of Columbia from which Plaintiff's claims arise.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because Defendant's principal place of business is in the District of Columbia and a substantial part of the events or omissions that form the basis of the claims occurred in the District of Columbia.

## FACTUAL ALLEGATIONS

### The EPC Contract

10. On or about November 3, 2021, Plaintiff executed a lease agreement with Gallaudet University in Washington, D.C. ("Gallaudet"), with the goal of developing several solar electric generating systems on building rooftops, parking lots, and other open parcels of land. The MSSD Garage was one of the properties Gallaudet leased to Plaintiff for the purpose of constructing, installing, operating, and maintaining a solar electric generating system.

11.     To facilitate the installation of electrical generation systems at Gallaudet, on or about June 30, 2022, Plaintiff and Defendant entered into an EPC Contract, under which Defendant agreed to design, procure, construct, install, and commission solar photovoltaic electric generation systems at various sites at Gallaudet. The EPC Contract is governed by the laws of the State of New York. *See* Ex. A, EPC § 13.2.

12.     While the EPC Contract provided general terms governing the parties' relationship, each project at Gallaudet would be based upon a project-specific SOW. *See, e.g.*, Ex. A, EPC Contract § 1.1 ("The total price for design, materials and construction of a PV System, (the 'Contract Price') shall be specified in the SOW for such Project and shall include all components of the Work as defined in Section 3 and such SOW for such Project.").

13.     Regarding the scope of work for each project, the EPC Contract states:

> Contractor will provide all labor, equipment, and materials required to install and will install a functioning PV System at the Site(s) as more fully described in each SOW, the form of which is provided in Appendix A (the "Work") and shall perform the Work based on a standard of care dictated by prudent industry practices for contractors of similar experience working on similar projects, in accordance with applicable law.

Ex. A, EPC Contract § 3.1.

14.     As to the start of the Project, the EPC states:

> Notice to Proceed ("NTP"). NTP with respect to a Project shall occur upon satisfaction (or, except with respect to any Change Order issued by Contractor, waiver by Customer) of the Pre-NTP Conditions listed in the SOW for such Project to the reasonable satisfaction of the Customer. NTP may be issued by Customer via electronic mail, provided Contractor confirms receipt.

Ex. A, EPC Contract § 1.2.2.

15.     Regarding the ability of the MSSD Garage to handle the solar electric generation system, the EPC Contract states:

> *As part of the Work, Contractor will perform structural engineering analysis to determine rooftop weight-load capacity and confirm that all structures meet all static and dynamic load requirements necessary under applicable building codes for similar types of solar PV systems*. Customer acknowledges that additional structural reinforcements, and/or methods of reducing ballast load requirements, such as physical attachment points, may be required to allow the PV System to withstand wind/weight loads. Any such improvement cost is excluded from the Contract Price but shall be identified and, if required, included in a request for Change Order prior to NTP. *To the extent identified prior to NTP, both parties are excused from the performance under the applicable SOW with respect to the impacted PV System without penalty in the event that such structural improvements are needed* . . . .

Ex. A, EPC Contract § 3.2.1 (emphasis added).

16.    The EPC Contract also provided that Defendant was responsible for Mechanical Completion, Substantial Completion, Final Completion for the Project, as well as meeting certain performance guarantees. *See* Ex. A, EPC Contract §§ 1.2.5–1.2.7, 1.5, 10.

17.    Under the EPC Contract, Defendant also covenanted and agreed "to perform the Work, or to cause the performance of the Work to be, consistent with the professional skill and care ordinarily provided by similar, sophisticated engineering, procurement, and construction firms practicing in the same or similar locality under the same or similar circumstances." Ex. A, EPC Contract § 4.2.

18.    Defendant also agreed that Plaintiff was to be named as an additional insured under Defendant's insurance coverage. *See* Ex. A, EPC § 15 & App'x D.

19.    Regarding indemnification of Plaintiff, the EPC Contract states:

Contractor shall fully indemnify, hold harmless, release and defend Customer and Customer's officers, employees, and agents from and against any and all actions, claims, demands, damages, disability, losses, expenses (including, but not limited to, reasonable attorneys' fees and other defense costs), and liabilities of any nature (including, but not limited to property damage and personal and bodily injury, sickness, and disease) to the extent caused by Contractor, any subcontractor or supplier of the Contractor, anyone of their officers, employees, subcontractors, agents or others directly or indirectly employed by any of them, or anyone for

5

whose acts they may be responsible (each, a "Contractor Party"), in each case as it relates to performance under this Contract, including to the extent caused by:

…

(iii) breach of any obligation, representation, or warranty contained herein; (iv) negligence, gross negligence, or willful misconduct;

…

The indemnification obligations in this Section shall survive the expiration or termination of this Contract.

Ex. A, EPC Contract § 8.

20.     Regarding remedies upon Defendant's default, the EPC Contract states:

If an Event of Default by either Party occurs, the non- defaulting Party shall be entitled to obtain any available legal or equitable remedies including, without limitation, recovering amounts due and unpaid and/or damages, which shall include the non-defaulting Party's reasonable, actual, direct out-of-pocket losses incurred by reason of such Event of Default (including reasonable attorneys' fees), but which shall not include any consequential, punitive or indirect damages (other than third party indemnification claims under Section 8 and liquidated damages expressly set forth herein) ).

Ex. A, EPC Contract § 22.2.

21.     Regarding the Scope of Work and Integration, the EPC Contract states:

Time is of the essence with regard to performance of this Contract. No modification or waiver of this Contract is valid unless in writing and signed by both the Parties. This writing constitutes the entire integrated agreement of the Parties and supersedes all prior agreements and discussions. Neither party is bound by any representation, warranty, promise, statement, or information, unless it is specifically incorporated into this Contract. If any part of this Contract is held to be unenforceable for any reason, then that part will be stricken and the remainder of this Contract will remain in full force and effect. This Contract will bind and inure to the benefit of the Parties' respective heirs, executors, administrators, successors, and permitted assigns.

Ex. A, EPC Contract § 19.3.

**The Statement of Work**

22.     As contemplated by the EPC Contract, on or about August 24, 2023, the parties executed a Statement of Work (the "SOW") for the MSSD Garage Canopy Project, with an estimated PV System Size of 362.9 kWdc and a Contract Price of $1,665,308.00. A true and accurate copy of the SOW is attached hereto as **Exhibit B**.

23.     The SOW included the following milestones and schedule deadlines for the Project:

| Milestone | Completion Date |
|---|---|
| 1.    SOW Execution | 8/18/23 |
| 2.    Feasibility Approval | 9/18/23 |
| 3.    NTP | 11/30/23 |
| 4.    Mobilization | 12/15/23 |
| 5.    Material Delivery | 12/15/23 |
| 6.    Mechanical Completion | 3/01/24 |
| 7.    Substantial Completion | 4/01/24 |
| 8.    Final Completion | 5/3/24 |
|  |  |

Ex. B, SOW at 1.

24.     As to the second milestone, the SOW defined Feasibility Approval as follows and provided for termination of the SOW if the garage did not "have sufficient reserve capacity" for the Project:

> **Feasibility Approval ("Feasibility").** Feasibility Approval is granted when the results of the GPR scans, coring of concrete, and Windsor tests have proven the garage to have sufficient reserve capacity for canopy as granted in writing by the designated canopy fabricator and in the designated canopy fabricator's sole discretion; provided, however, *that if Feasibility Approval is not granted or the designated canopy fabricator or Contractor provide written notice to Customer that Feasibility Approval is not granted, neither party shall have any further obligations or liability to the other with respect to this SOW and the SOW shall be deemed terminated in all respects as of the date such written notice is provided to Customer*.

Ex. B, SOW § 1.1 (emphasis added).

25.     Pursuant to Section B of the SOW, Defendant was required to "provide all labor, equipment and materials required to install and will install a functioning PV System at the Site[,]" and specifically was to provide "[s]tructural engineering analysis to determine rooftop weight-load capacity." Ex. B, SOW § B(a).

26.     Regarding Pre-NTP conditions that must be satisfied before construction, the SOW required the following items to be completed:

(a) ***Contractor provides written evidence or verification from an independent structural engineering firm, in form and substance reasonably acceptable to Customer, that the portion of the solar system to be installed on the building roof will not adversely impact the structural integrity of the building roof***;
(b) Contractor has provided detailed construction drawings which have been shared with and approved by Customer;
(c) final system size, location, and equipment have been selected for the project and approved by the Customer;
(d) if applicable, Contractor has issued a Change Order under Section 3.2.1 and Customer has agreed to such Change Order; and
(e) Customer provides Contractor with written notice to proceed.

Ex. B, SOW § E (emphasis added).

27.     The SOW further provided that Defendant "shall perform a structural analysis based on the final design specifications." Ex. B, SOW § H(d).

28.     Section H of the SOW also provided that Defendant was to "use reasonable care in the conduct of all its operations at the Site to prevent injury or damage to property or persons" and prohibited Defendant from causing, maintaining, or permitting the Site to be used in any way that "could reasonably be expected to create any nuisance in, on or impacting the Site" or "unreasonably interfere with Gallaudet University's use or operation of the Site or the Gallaudet University Campus."

29.     In addition to the obligations above, the SOW also entitled Plaintiff to liquidated damages for every day after April 1, 2024, where Defendant failed to achieve Substantial Completion. *See* Ex. B, SOW at 1–2.

**Defendant Begins (Defective) Contract Performance**

30.     After executing the EPC Contract but prior to executing the SOW, Defendant began investigating whether the MSSD Garage had sufficient capacity for a solar canopy and, if so, to design a system that could safely be erected on the MSSD Garage.

31.     To perform its work, Defendant hired Greenman-Pedersen, Inc. ("GPI"), which previously acquired Holbert Apple Associates, Inc. ("HAA") in January 2022, to analyze the reserve capacity of the MSSD Garage and its ability to support a solar canopy.

32.     On or about October 14, 2022, GPI prepared a document titled Gallaudet University – MSSD Garage Solar Panel Canopy Feasibility Reserve Column Capacity – GPI Markup ("GPI Markup"). A true and accurate copy of the GPI Markup is attached hereto as **Exhibit C**.

33.     In the GPI Markup, GPI provided calculations related to a top level framing plan to add a solar canopy to the MSSD Garage and importantly stated as follows:

> ***Prior to drilling for new post-installed anchors and prior to steel fabrication of solar canopy structure, locate existing column and slab reinforcing and slab post-tensioned cables using x-ray, then verify depth of reinforcing and post-tensioned cables using GPR***, do not cut or damage any existing reinforcing or post-tensioned cables.

Ex. C (emphasis added).

34.     At some point after the October 2022 GPI Markup, Defendant contracted with Solar Mounts, LLC ("Solar") to create a design for a solar canopy for the Project that would meet the requirements of the EPC Contract.

9

35.    On July 14, 2023, Defendant informed Plaintiff that phase one, totaling $20,525.00 would be sufficient to determine whether the Project could move forward. Phase one would include taking 3 GPR scans, zero rebar scans, coring concrete in four places, testing the strength of the concrete in four places, doing Windsor probe tests, and providing an engineering report.

36.    Defendant further stated that phase two would consist of Solar gathering information needed to determine the placement of the columns for the solar canopy. Phase two would consist of Solar conducting 23 GPR scans and zero rebar scans.

37.    However, even though the GPI Markup indicated that additional GPR and X-ray scans were needed, Defendant did not complete a full structural analysis of the MSSD Garage to determine if it could bear the weight of the solar canopy Defendant designed.

38.    On or around September 19, 2023, Plaintiff paid Defendant $33,306.16 for the execution of the SOW.

39.    On September 28, 2023, Defendant provided Plaintiff with Solar's preliminary drawing and calculations for constructing the Project ("September 2023 Preliminary Design"). A true and accurate copy of the September 2023 Preliminary Design is attached hereto as **Exhibit D**.

40.    Plaintiff did not receive any structural analysis demonstrating the MSSD Garage's ability to support the weight of the September 2023 Preliminary Design.

41.    On or around December 13, 2023, Solar then subcontracted with SOL Engineering Solutions, LLC and/or DOTec Engineering ("DOTec") to perform structural calculations for its design of the Project (the "Solar Calculations"). A true and accurate copy of that analysis is attached hereto as **Exhibit E**. The Solar Calculations were approved and stamped by Ildefonso Gonzalez, a D.C.-licensed professional engineer.

10

42.     On January 26, 2024, Defendant provided Plaintiff with the Solar Calculations and a stamped structural design of the Project.

43.     On February 20, 2024, in reliance on Defendant's representations concerning the feasibility of the proposed design, the stamped Solar Calculations, and the stamped structural design of the Project, Plaintiff approved the Notice to Proceed.

44.     At no time did Plaintiff and Defendant formally modify the project schedule to reflect that the Feasibility Approval and Notice to Proceed occurred after the agreed-upon deadlines.

45.     On or about March 28, 2024, Plaintiff paid Defendant $249,796.20 for the Feasibility Study Approval milestone under the EPC Contract.

46.      On April 22, 2024, Defendant provided Plaintiff with its 90% proposed design (the "Proposed Design"). A true and accurate copy of the Proposed Design is attached hereto as **Exhibit F**.

47.     Defendant's Proposed Design would not materially impact parking (~17 spaces impacted) in the MSSD Garage (the "MSSD Plan").

48.     At no time did Defendant inform Plaintiff that it had not completed a structural analysis of the entire MSSD Garage to ascertain its capabilities to support the weight of the Proposed Design.

### Discovery of Defendant's Design Failures

49.     On July 18, 2024, Plaintiff, Gallaudet, and Defendant met to discuss the Project status, Solar's mobilization on July 24, 2024, closure of the MSSD Garage, and removal of lighting from the top level of the MSSD Garage as Defendant and Solar entered the construction phase.

11

50.    On July 24, 2024, Solar mobilized on the Project site. However, Solar abandoned the site shortly thereafter due to alleged issues with the column baseplates relating to a more complex design/setup with the tension cables and rebar than reflected in their feasibility studies and proposed design. On August 8, 2024, Plaintiff, Gallaudet, and Defendant met to discuss the Project status and the issues with the baseplates based on the existing concrete structure.

51.    Despite Solar abandoning the site, on or around September 5, 2024, Plaintiff paid Defendant $582,857.80 for the Mobilization ($166,530.80) and Material Delivery ($416,327.00) milestones under the EPC Contract.

52.    Subsequent to site abandonment, on October 9, 2024, Defendant completed its 100% Issued For Construction ("IFC") Design. A true and accurate copy of the IFC Design is attached hereto as **Exhibit G**.

53.    On or around October 10, 2024, and despite having just completed its IFC Design, Defendant informed Plaintiff that it and Solar had identified an issue with the design and constructability of the Project—involving the interaction between the column baseplates and post-tension cables running in both the north–south and east–west directions. Defendant stated that it was still assessing the issue to avoid potential structural damage.

54.    Defendant further represented that baseplate templates had been delivered to its warehouse but were too heavy and unwieldy for field use, requiring the fabrication of new, more manageable templates. According to Defendant, once revised templates were prepared, additional ground-penetrating radar ("GPR") scans needed to be conducted to qualify each column and re-drill anchor holes while avoiding interference with the tension cables. Defendant asserted that these efforts were ongoing and that it intended to minimize the impact of these unresolved issues on the Project schedule.

55. Defendant informed Plaintiff that it would mobilize an advanced GPR company to use specialized machinery to scan and create a 3-D model showing all the steel in the column and slab. In or around October or November 2024, Defendant or Solar hired Ground Penetrating Radar Systems, LLC ("GPRS") to create a 3-D model of the project and conduct GPR scans.

56. On November 7, 2024, Plaintiff, Gallaudet, and Defendant met to discuss the Project status and the pending GPR scans. Defendant informed Plaintiff that Solar would be back on the Project site the following week.

57. On November 19, 2024, Plaintiff and Defendant discussed the lack of progress on the Project. During that discussion, Defendant advised that decisions were still being made regarding the scope and margin of GPR scans required for the garage columns, explaining that the work required heightened precision because any drilling error in a structure as old as the MSSD Garage could result in the garage being condemned. Plaintiff later reminded Defendant that the MSSD Garage had been closed for months and that a workable schedule to complete the Project was needed.

58. On November 26, 2024, Defendant informed Plaintiff that GPRS would begin the GPR scans of the foundation columns on December 2, 2024. Defendant later updated, on December 4, 2024, that GPRS would finish scanning the foundation columns the following week.

59. On December 9, 2024, Defendant informed Plaintiff that the GPR scan process was ongoing and that it will take time for Solar to analyze the results. But Defendant informed Plaintiff that it expected Solar to return to the Project site by February 2025, and Plaintiff requested that Defendant ask Solar to remobilize sooner.

60. On January 14, 2025, Plaintiff emailed Defendant for a status update because Solar had not been on site since July 2024. Although additional GPR scans were taken in late 2024,

Solar's remobilization date of January 21, 2025, was pushed back because Defendant and Solar believed that additional modeling was needed. Plaintiff expressed concerns about the Project's trajectory.

61.    On January 14, 2025, Defendant notified Plaintiff that there were additional delays on the Project because the GPR scans needed to be modified and that Solar would not return to the Project site until February 10, 2025.

62.    On January 23, 2025, Plaintiff again emailed Defendant for an update on the Project. Later that day, Defendant's Project team informed Plaintiff that they spoke with Solar and that Solar determined that the GPR scans indicate that because there are rebar cages as well as trays holding the tension cables, the exact location of the tension cables in the concrete is difficult to determine. Defendant informed that it was seeking to determine how many baseplate locations are affected, and how that will affect the design, construction timeline and cost. Defendant also emailed Plaintiff and Gallaudet a set of slides reflecting the Project issues.

63.    Also on January 23, 2025, Defendant proposed that Solar would complete construction by approximately April 3, 2025, and that, by April 18, 2025, Defendant would complete module stringing, reinstall lighting, and finalize remaining electrical work.

64.    In January or February 2025, Defendant also hired a third-party structural engineer, Chris Kim, P.E., of Barun Corp ("Barun"), a company which specializes in commercial solar design and engineering, to confirm the structural analysis of the MSSD Garage.

65.    On February 20, 2025, Plaintiff, Gallaudet, and Defendant met to discuss next steps to move forward with the Project's construction. Defendant stated that it would get Solar to remobilize on the Project site, complete installation of the concrete column construction, and

14

complete the construction by April 11, 2025, at which point Defendant would be able to string the modules, install lights, and wire the remaining electrical equipment by April 25, 2025.

66.     Shortly after the February 20 meeting, Plaintiff notified Defendant by email that it was enforcing liquidated damages against Defendant as permitted under the EPC Contract.

67.     Barun provided its findings in a letter dated February 26, 2025 (the "Barun Letter"), which states "[I]t is my professional opinion that the roof is not suitable to receive loads from canopy structure. We recommend flush mounted system, which can remove roof live load." A true and accurate copy of the Barun Letter is attached hereto as **Exhibit H**.

68.     On February 27, 2025, Plaintiff, Gallaudet, and Defendant met and discussed the Project. At this meeting, Plaintiff learned that Barun's analysis conflicted with the GPI Markup that was completed at the beginning of the Project. Defendant also shared the findings from Barun and acknowledged that the current design was not constructible as proposed. Defendant then shared the Barun Letter with Plaintiff on February 28, 2025.

69.     After receiving Barun's findings, Defendant informed Plaintiff that it had re-engaged GPI to reanalyze Barun's findings, its own analysis, and the Solar Calculations.

70.     On March 14, 2025, Plaintiff and Defendant discussed the state of the Project and the pending reanalysis by GPI. Defendant offered two solutions to make the current design workable: (1) building a canopy that spans the garage, independent of the existing structure; or (2) introducing Plaintiff to Defendant's technical engineering counterparts.

71.     On March 28, 2025, GPI provided its revised analysis to Defendant based on the review by Barun ("Revised GPI Analysis"). A true and accurate copy of the Revised GPI Analysis is attached hereto as **Exhibit I**.

72.     Also on March 28, 2025, GPI provided its review of Solar's Proposed Design and structural calculations ("GPI Review of Solar Calculations"). A true and accurate copy of the GPI Review of the Solar Calculations is attached hereto as **Exhibit J**.

73.     GPI determined that "there [were] deficiencies in the original design of the top level/roof slab in relation to current code requirements" and that its original assumptions were incorrect. Ex. I, Revised GPI Analysis at 1. GPI also noted that the Project could not be built as designed because of the amount of "existing rebar or PT tendons" in the core locations of the concrete slabs. Ex. J, Revised GPI Analysis at 6.

74.     On April 2, 2025, Defendant emailed Plaintiff copies of both the Revised GPI Analysis and GPI Review of the Solar Calculations and informed Plaintiff that Barun did not complete a full analysis of all levels of the MSSD Garage because "their analysis on the top floor alone was already not looking good." In that same email, Defendant also noted that GPI was not confident that the Solar Report and design were clear enough as they did not provide sufficient details to determine viability.

75.     In admitting that the initial feasibility study was defective and/or not properly performed, Defendant failed its Pre-NTP Condition requirements, such as "provid[ing] written evidence or verification from an independent structural engineering firm, in form and substance reasonably acceptable to Customer, that the portion of the solar system to be installed on the building roof will not adversely impact the structural integrity of the building roof." Ex. A, EPC Contract at 19.

76.     Defendant's failure to properly perform a feasibility study for the Project and structural analysis of the MSSD Garage also deprived Plaintiff of its opportunity to terminate the Project pre-NTP without incurring further costs.

16

77.     Accordingly, on April 10, 2025, Plaintiff instructed Defendant to stop work so that all interested parties could discuss how to resolve the issue of the infeasible design.

78.     During this delay from July 24, 2024, through April 10, 2025, Plaintiff and Defendant did not execute a change order to modify the project schedule to reflect that the failure to achieve Mechanical Completion or Substantial Completion by the agreed-upon, and now long-past, deadlines.

**Cancellation Due to Defendant's Deficient Design and Impossibility to Construct**

79.     On or about the week of April 21, 2025, Plaintiff was advised that the MSSD Garage project could not be completed in accordance with the Approved MSSD Plan.

80.     At no time before or after this point had Plaintiff received any change order requests from Defendant regarding the design defect or impossibility of implementing the design in accordance with the Approved MSSD Plan.

81.     On or about April 28, 2025, Defendant emailed Plaintiff a subsequent ballasted design plan to remediate the failure of the initial design (the "Re-design"). Defendant, upon Plaintiff's request, provided additional details for that remedial design, which included a helioscope model for Defendant's Re-design (the "Email and Re-design Attachment"). A true and accurate copy of the Email and Re-Design Attachment is attached hereto as **Exhibit K**.

82.     Under the previously Approved MSSD Plan, construction of the system was only going to impact approximately 17 spaces, but Defendant's ballasted Re-design "will use all the space on the upper deck, which would eliminate parking on the upper deck." *See* Ex. K at 2.

83.     Pursuant to the SOW, Plaintiff and Gallaudet had the right to review and approve Defendant's design to ensure that it "will not unreasonably interfere with Gallaudet University's operation or maintenance" of the MSSD Garage" Ex. B, SOW §§ E., H.f.

84.    On May 1, 2025, Plaintiff and Gallaudet met to review the Re-Design. That same day, Plaintiff informed Defendant that Gallaudet rejected the Re-Design as it would have significantly decreased parking space in the garage and that "Gallaudet cannot approve a solution which would eliminate parking on the upper deck." *See* Ex. K at 1.

85.    In its May 1, 2025 email, Plaintiff also reminded Defendant that Defendant needed to come up with a plan to address removal of material from the MSSD Garage, repair the curbs, reinstall lights, remove the inverters added during the Project, provide temporary power if needed, and discuss the conduit and IX equipment with Gallaudet.

86.    In June 2025, after months of the Project remaining inactive based on Defendant's design failures and Defendant's abandonment of its duties under the EPC Contract, Plaintiff determined it needed to seek reimbursement from Defendant.

87.    On or about June 12, 2025, given the impossibility to construct a feasible project in accordance with the Feasibility Approval, Plaintiff requested reimbursement of the money it paid to Defendant and cancelled the Project ("June 12, 2025 Email and Attachment"). A true and accurate copy of the June 12, 2025 Email and Attachment is attached hereto as **Exhibit L**.

88.    Because payments were segmented based on Project milestone events, at the time of Plaintiff's June 12, 2025 Email and Attachment, Plaintiff had paid Defendant $1,115,756.36 to date for the unbuilt MSSD Garage Canopy Project in accordance with the following schedule:

| Milestone | Percentage | Amount | Date Paid |
|---|---|---|---|
| SOW Execution | 2% | $33,306 | September 19, 2023 |
| Feasibility Approval | 15% | $249,796 | March 28, 2024 |
| NTP | 15% | $249,796 | May 23, 2024 |
| Mobilization on Site | 10% | $166,530 | September 5, 2024 |
| Material Delivery | 25% | $416,327 | September 5, 2024 |

Ex. B, SOW at 6. Of the amounts paid to Defendant, Plaintiff incurred and paid approximately $1,082,450.00 based upon Defendant's representations that the Project was in fact feasible.

18

89.    Despite multiple demands for payment and resolution, Defendant has failed to reimburse Plaintiff for the payments made under the EPC Contract.

**Defendant's Failure to Restore Site to Original Condition**

90.    On or about June 12, 2024, and although behind schedule, Defendant notified Plaintiff that it would begin mobilizing and delivering materials to the Site. Before discovering that the Project could not be completed as designed, Defendant mobilized and began construction activities at the Site in July 2024, including predrilling the deck for base plates, removing curb sections for columns, setting inverters, and running AC/DC cabling from inverters to the MSSD Garage's low voltage switchgear.

91.    Because of Defendant's mobilization, part of the top deck of the garage was closed and that closure limited Gallaudet's ability to use the MSSD Garage.

92.    On July 30, 2024, Kassandra Reyes Liste emailed Plaintiff that Defendant had successfully mobilized and delivered materials to the Project site, including invoices 100535 and 100536 for Plaintiff's accounting department.

93.    Due to the errors described above, Defendant abandoned the Site by the first week of August 2024 and never returned to complete construction, yet the top Deck remained closed after Defendant's abandonment.

94.    On August 5, 2025, Plaintiff informed Defendant that it rejected invoice 100536 because it reflected costs associated with a change order that had not been executed in that amount.

95.    On or about September 5, 2024, Plaintiff paid Defendant the costs for the Mobilization ($166,530.00) and Material Delivery ($416,327.00) milestones. After payments for Mobilization and Material Delivery, Plaintiff had paid Defendant $1,115,756.00 of the

$1,665,308.00 total payment under the Agreement, representing approximately 67% of the total EPC Contract price.

96.     After it became known that the Project could not be completed, Defendant left portions of the MSSD Garage where it had begun construction in a condition contrary to that required pursuant to the Agreement and in an unsafe condition which created a nuisance. Defendant's abandonment of the Site resulted in unreasonable interference of Gallaudet's usage of the MSSD Garage.

97.     To rectify this unsafe condition, on or about May 1, 2025, Plaintiff requested that Defendant restore the MSSD Garage to its original working condition.

98.     On or about October 8, 2025, Plaintiff again requested that Defendant restore the Site to its original condition because it was left in an unsafe condition, lacked adequate lighting for nighttime hours, and created a nuisance to Gallaudet. A true and accurate copy of the Plaintiff's October 8, 2025, letter is attached hereto as **Exhibit M**.

99.     Despite Plaintiff's written demands, Defendant refused to complete the restoration work. Thus, Defendant failed to restore the Site to its original condition, including failure to repair curbs, pilot holes, and spalls caused by the preparation of the Site for the work; failure to replace lighting and poles removed for the installation of racking; failure to move excess equipment (including inverters) to the Central Utilities Building storage location as directed by Gallaudet; and failure to remove all materials in, on, or within the vicinity of the MSSD Garage.

100.    To address the issues left by Defendant's unfinished construction site, on January 5, 2026, Plaintiff hired S-Works Construction Corporation ("S-Works") to restore the MSSD Garage to its original working condition.

101.    Under the contract, S-Works scope of work included the removal of solar-related electrical infrastructure that had been installed by Defendant but never placed into service, including the removal of five SMA inverters, one electrical accumulation panel, and all associated conduits, hangers, supports, and fasteners. S-Works was also required to restore the garage's lighting system by furnishing and installing fourteen new light poles and fourteen new LED light fixtures with photocells, along with new branch circuits tied back to the original splice points or electrical panels.

102.    These measures were necessary because the original lighting infrastructure had been removed during preparations for the solar canopy and could not be located for reuse.

103.    S-Works also performed extensive concrete and structural remediation to address physical alterations made to the garage deck.

104.    Additionally, S-Works drilled and installed fourteen new anchor bolt assemblies to support replacement light poles atop the existing parapet wall, including epoxy-set galvanized anchor bolts and related mounting hardware. Because of the condition of the existing concrete, S-Works included a concrete repair allowance to address potential cracking or damage resulting from this work.

105.    The cost of the work was $85,553.00. Plaintiff seeks recovery of this amount from Defendant based on Defendant's failure to adhere to the contract terms and restore the Project site condition to its original state.

106.    Even after hiring S-Works, Plaintiff still received a formal notice of claim from Gallaudet regarding property damage at the MSSD Garage as a result of Defendant's actions and omissions. A true and accurate copy of that letter is attached hereto as **Exhibit N**.

107.    In December 2025, pursuant to Section 13.1 of the EPC Contract, Plaintiff sought a meeting with Defendant in an attempt to resolve the dispute giving rise to this Litigation according to Section 13.1 of the EPC Contract. The parties met in January 2026 but were unable to resolve the dispute.

### COUNT I – Breach of Contract

108.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of the Complaint as if they were fully restated.

109.    On June 30, 2022, Plaintiff and Defendant executed the EPC Contract, which is a binding and enforceable agreement.

110.    Plaintiff fully performed under the EPC Contract and SOW, including remitting all requisite milestone payments to Defendant.

111.    Pursuant to the EPC Contract and the SOW, Defendant was obligated to and responsible for, among other things, the following:

(a)    "to perform the Work, or to cause the performance of the Work to be, consistent with the professional skill and care ordinarily provided by similar, sophisticated engineering, procurement, and construction firms practicing in the same or similar locality under the same or similar circumstances." Ex. A, EPC Contract § 4.2;

(b)    perform structural engineering analysis to determine rooftop weight-load capacity and electrical engineering and design of the final PV System. Ex. B, SOW at 3–4;

(c)  Provide a design that allowed for construction of the Project on the MSSD Garage without "adversely impact[ing] the structural integrity of the building roof." Ex. B, SOW at 4;

(d)  "[P]erform a structural analysis based on the final design specifications." Ex. B, SOW at 5; and

(e)  Complete construction of the Project by May 3, 2024.

112.  Despite those obligations, Defendant breached the Agreement by:

(a)  failing to propose a solar canopy design that was possible to construct on the MSSD Garage;

(b)  failing to conduct and provide an adequate feasibility study or structural analysis for its proposed design;

(c)  improperly certifying that the Project and design were feasible when in reality the Project could not be constructed as designed;

(d)  failing to complete Mechanical Completion by the completion date;

(e)  failing to complete construction by the Guaranteed Substantial Completion Date;

(f)  failing to reach Final Completion of the Project by the agreed-on date; and

(g)  failing to perform the Work, or to cause the performance of the Work to be, consistent with the professional skill and care ordinarily provided by similar, sophisticated engineering, procurement, and construction firms practicing in the same or similar locality under the same or similar circumstances.

113.  Defendant also breached the EPC Contract by failing to restore the Site to its original condition after the Project was cancelled, and by leaving the Site in an unsafe condition

that created a nuisance—that unreasonably interfered with Gallaudet's use of the MSSD Garage—in violation of Section H of the SOW.

114.    Defendant also agreed to under Section 8 of the EPC Contract to indemnify Plaintiff for "any breach of any obligation, representation, or warranty contained" in the EPC Contract. One of Defendant's many obligations was not to "unreasonably interfere with Gallaudet University's operation or maintenance of the Site," and by failing to restore the Site to its original condition—Defendant breached that obligation. Because Defendant agreed to indemnify Plaintiff for any breaches of Defendants' obligations, Defendant is liable to Plaintiff for the amounts paid by Plaintiff, including costs to restore the Site to its original condition.

115.    Defendant also breached the EPC Contract by failing to name Plaintiff as an additional insured under Defendant's insurance coverage. *See* Ex. A, EPC § 15 & App'x D

116.    Defendant also breached the EPC Contract because Defendant did not achieve substantial completion by the deadline agreed to by the parties. Plaintiff suffered delay damages based on an agreed to amount of $500 per day in delay liquidated damages pursuant to the EPC Contract and SOW. The delay liquidated damages were in effect from April 1, 2024, to June 12, 2025, and amount to no less than $218,500.00.

117.    As a direct and proximate result of Defendant's breach, Plaintiff has been damaged in an amount of at least $1,386,503.00, plus internal costs, general and administrative expenses, insurance costs, and other costs to be determined at trial.

118.    Plaintiff has also been damaged by being forced to incur attorneys' fees, costs and expenses in pursuit of this action, which Plaintiff is entitled to recover under Section 22.2 of the EPC Contract.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enters judgment in its favor and against Defendant as follows:

(a)    Award Plaintiff monetary damages for monies paid to Defendants under the contracts executed between the parties, in an amount not less than $1,168,003.00;

(b)    Award Plaintiff monetary damages for delays caused by the failure to complete the work by the agreed date, in an amount not less than $218,500.00 in liquidated damages, pursuant to Sections 1.5 and 22.2 of the EPC Contract and page 2 of the SOW;

(c)    Award Plaintiff its costs, attorneys' fees, and expenses pursuant to Section 22.2 of the EPC Contract and applicable law;

(d)    Award Plaintiff pre- and post-judgment interest as permitted by law; and

(e)    Enter all such other relief in favor of Plaintiff as this Court deems just and proper.

## **Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated March 31, 2026                         Respectfully Submitted,

/s/ *Chukwukpee Nzegwu*
Jeremy Baker (*pro hac vice forthcoming*)
WOMBLE BOND DICKINSON (US) LLP
8350 Broad Street, Suite 1500
Tysons, VA 22102
Phone: (703) 394-2240
Fax: (703) 790-2623
Email: Jeremy.Baker@wbd-us.com

25

Chukwukpee Nzegwu (Bar No. MD0175)
WOMBLE BOND DICKINSON (US) LLP
100 Light Street, 26th Floor
Baltimore, MD 21202
Phone: (410) 545-5861
Fax: (410) 545-5801
Email: Chukwukpee.Nzegwu@wbd-us.com

*Attorneys for Plaintiff SMS DC CS01B, LLC, d/b/a
Scale Microgrids*